

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
CERVINO CAPITAL MANAGEMENT LLC, for its
investors Annamaria Steardo, et al., on behalf
of itself and all others similarly situated,

                   Plaintiff,

          -against-

PARNON ENERGY, INC., ARCADIA PETROLEUM,
LTD., ARCADIA ENERGY SUISSE, SA,
NICK WILDGOOSE, JAMES DYER
and JOHN DOES 1-10,

                 Defendants.
------------------------------------------------------------X

Docket No.

**CLASS ACTION
COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff Cervino Capital Management LLC for its investors Annamaria Steardo, et al.

("Plaintiff"), on behalf of itself and of all others similarly situated, by its undersigned attorneys,

for its Complaint against the above-named defendants ("Defendants"), upon knowledge as to

matters relating to itself and upon information and belief as to all other matters, alleges as

follows:

## FACTS UNDERLYING THE ACTION

1.     Defendants (as more fully set forth at ¶¶ 15-22, <u>infra</u>), through diverse means,

lawful and unlawful, manipulated and made artificial the prices of crude oil futures and options

on futures contracts (hereinafter sometimes jointly referred to as "Crude Oil Contracts" or "WTI

Derivatives") traded on the New York Mercantile Exchange ("NYMEX") and Intercontinental

Exchange, Inc. or one of its subsidiaries or affiliates (collectively, "ICE") in this District and during the Class Period as defined in ¶ 24, infra.

2.    Specifically, Defendants:

a.    Caused the price of Crude Oil Contracts traded on NYMEX and ICE to be artificial by carrying out a cross-market trading scheme between January and April of 2008 involving the accumulation and sell-off of a substantial position in physical crude oil to manipulate futures prices;

b.    made millions of dollars in illicit profits via trading with the knowledge that Defendants' conduct would cause artificial prices; and

c.    concealed their manipulative trading from regulators and market participants.

3.    The Commodities Futures Trading Commission's ("CFTC") Enforcement Division filed a case against the Defendants named herein, alleging that during the relevant period Defendants traded futures and other contracts that were priced off of the price of West Texas Intermediate light sweet crude oil ("WTI"). WTI is delivered to commercial users at Cushing, Okla., a major crude oil delivery point. The price of WTI is a benchmark for crude oil prices around the world, and the supply of WTI at Cushing is an important driver of WTI price.

4.    According to the CFTC's allegations, Defendants conducted a manipulative cycle, driving the price of WTI to artificial highs and then back down, to make unlawful profits. First, they purchased large quantities of physical WTI crude oil during the relevant period, even though they did not have a commercial need for crude oil. They purchased the oil pursuant to their scheme to dominate and control the already tight supply at Cushing to manipulate the price

of WTI upward and to profit from the corresponding increase in value of their WTI futures and options contracts (WTI Derivatives) on NYMEX and ICE.

5. Next, once WTI reached artificially high prices and they had taken profits from their long WTI Derivative position, Defendants allegedly engaged in additional trading activity selling more WTI Derivatives short at the artificially high prices.

6. Finally, Defendants allegedly strategically sold off their physical holdings of WTI, mostly all on one day, to drive the WTI price back down and to profit from their short WTI Derivatives position.

7. Pursuant to this manipulative cycle, driving the WTI price up and then back down, which they conducted in January and March 2008, and attempted in April 2008, Defendants realized profits from their WTI Derivatives trading that exceeded $50 million, according to the CFTC complaint.

8. According to the CFTC complaint, to carry out their manipulative scheme, the Defendants took the following steps:

a. First, amassing a large physical WTI position, to be delivered the next month at Cushing, to dominate and control WTI supply even though they had no commercial need for crude oil;

b. Second, contemporaneously establishing a long near month/next month WTI Derivatives calendar spread position on the NYMEX and ICE with the intent to artificially inflate the value of that position by driving WTI prices higher;

c. Third, refraining from selling their physical WTI oil before the cash window opened, to lull the market into believing that they had committed their oil to storage or commercial use, and thus cause or contribute to causing the near month calendar spread to rise to an artificial level, to maximize the value of the their long WTI Derivatives position;

d.    Fourth, establishing a substantial short position in the subsequent series of WTI Derivatives calendar spreads at artificially high prices, knowing they were about to surprise the market with a surplus of physical WTI oil; and

e.    Finally, suddenly selling or "dumping" their physical position during the cash window, thus creating the surprise surplus they had planned all along, to drive prices back down and maximize the value of their short WTI Derivatives calendar spread position.

9.    In January and March 2008, by successfully executing the scheme, Defendants generated unlawful profits on the long WTI Derivatives position they acquired before driving prices up, and from the short WTI Derivatives position they established before driving prices back down.

10.    In particular, Dyer and Wildgoose (see ¶¶ 18-19, infra) caused, or contributed to causing, the following NYMEX /WTI calendar spread prices to be artificial on the specified dates:

a.    The February/March 2008 spread on January 16, 17, 18 and 22, 2008;

b.    the March/April2008 spread on January 23 and 24, 2008;

c.    the April/May 2008 spread on March 14, 17, 18 and 19, 2008; and

d.    the May/June 2008 spread on March 20 and 24, 2008.

11.    Defendants' manipulative trading caused traders of WTI Derivatives, including Plaintiff, to suffer substantial losses.

12.    Plaintiff now brings this class action under the CEA seeking recovery of damages resulting from Defendants' unlawful market manipulation scheme.

4

## JURISDICTION AND VENUE

13.   (I)   WTI is a "commodity" and is the "commodity underlying" NYMEX Crude Oil Contracts, as those terms are defined and used in Sections 1a(3) and 22 of the CEA, 7 U.S.C. §§ 1a(3) and 25.

(ii)   This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and 7 U.S.C. §§ 1 et seq.

(iii)   Venue is proper under 28 U.S.C. § 1391(a) and (b) and 7 U.S.C. § 25( c), because Defendants' manipulative course of conduct occurred in large part in this District and caused the prices of Crude Oil Contracts on NYMEX, which is located in this District, to be made artificial during the Class Period.

## PARTIES

14.   Plaintiff, a limited liability corporation organized and existing under the laws of the State of California with its principal place of business in Topanga, CA, traded Crude Oil Contracts during the Class Period.  Plaintiff was damaged by Defendants' manipulation of the price of Crude Oil Contracts to artificial levels.

15.   Defendant Parnon Energy Inc. is a corporation organized and existing under the laws of Texas with its principal place of business in Rancho Santa Fe, California.  Parnon

5

is a subsidiary of Parnon Holdings Inc., which is a wholly owned subsidiary of Farahead Holdings Ltd., and is an affiliate of Defendants Arcadia Petroleum Ltd. and Arcadia Energy (Suisse) SA (further discussed below). Parnon operates as a common enterprise with Arcadia Petroleum, Ltd. and Arcadia Energy (Suisse) SA. WTI physical oil and WTI Derivatives trades conducted by Parnon, Arcadia Petroleum, and Arcadia Suisse comprised their collective "WTI Book." During the Relevant Period, trades in the WTI Book were executed by one derivatives trader employed by Arcadia Petroleum, two derivatives traders employed by Arcadia Suisse, and one physical crude trader at Parnon (collectively with Defendants James T. Dyer and Nicholas J. Wildgoose, the "WTI Group"). Parnon's agents and employees buy and sell WTI physical oil and WTI Derivatives for profit, speculating on WTI price movements. Parnon has never owned or operated an oil refinery and is not an end user of crude oil.

16.    Defendant Arcadia Petroleum Ltd. is a corporation organized and existing under the laws of the United Kingdom with its office and principal place of business in London, England. Arcadia Petroleum is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Petroleum is engaged in the business of trading crude oil, crude oil products and oil derivatives for profit in various physical and financial markets throughout the world. During the relevant period Arcadia Petroleum officers in London supervised the WTI Group's trading and the financing of its trades, and its officers and employees handled the risk management, compliance, credit, financing, mid-office and back-office functions for Parnon and Arcadia Suisse, which did not have such personnel. One single individual was the CEO and Head Trader of Arcadia Petroleum, and performed the functions of CEO for Parnon and Arcadia Suisse. Wildgoose, Dyer, and the other WTI Group traders reported to this individual.

6

17.    Defendant Arcadia Energy (Suisse) SA is a corporation organized and existing under the laws of Switzerland with its office and principal place of business located in Morges, Switzerland.  Arcadia Suisse is a wholly owned subsidiary of Farahead Holdings Ltd.  Arcadia Suisse is engaged in the business of trading crude oil derivatives for profit on various exchanges including NYMEX and ICE.  During the relevant period an open, two-way communication line was maintained between the Parnon office in California and the Arcadia Suisse office in Switzerland, so that traders in one office could hear and participate in conversations among the traders at the other office.  Parnon's WTI physical position and Arcadia Suisse's WTI Derivatives position were described in daily position reports, which were transmitted via email to and reviewed by Dyer, Wildgoose and the CEO of Arcadia Petroleum.

18.    Defendant James T. Dyer is an individual residing in Brisbane, Australia. During the relevant period Dyer was an experienced crude oil trader.  From approximately 2005 through at least 2008, Dyer was responsible for the strategy and trading in the WTI Book.  In 2007, in the process of setting up a U.S. trading arm for Arcadia Petroleum, Dyer traveled to the U.S. to meet with and recruit Wildgoose and to negotiate with TEPPCO Partners Inc. on behalf of Arcadia Petroleum for the building of storage tanks that would demonstrate to the market Arcadia Petroleum's ability to store large quantities of physical oil. Dyer acted on behalf of and as agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. In 2008, Dyer earned a base salary and was eligible for and received a bonus based upon the profitability of the WTI Book.

19.    Defendant Nicholas J. Wildgoose is an individual residing in Rancho Santa Fe, California. During the relevant period Wildgoose, a crude oil trader, was jointly

responsible with Dyer for the strategy and trading in the WTI Book. Wildgoose acted on behalf of and as an agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. Wildgoose received a base salary and was eligible for and received bonuses based upon the profitability of the WTI Book.

20.      Plaintiff alleges on information and belief that at all relevant times, Defendants John Does 1-10, inclusive, were also engaged in the manipulation of Crude Oil Contracts as alleged herein.

21.      Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does 1-10 inclusive.

22.      The acts alleged in this Complaint to have been committed by Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## CLASS ALLEGATIONS

23.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP").

24.      The Class in this action ("Class") consists of persons, other than Defendants, their employees, affiliates and co-conspirators, who purchased, sold, held or otherwise transacted in Crude Oil Contracts from the earliest date permitted under the applicable

statute of limitations until the present date or any later date when Defendants' unlawful scheme or its effects shall conclude ("Class Period").

25.   NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC for approval various rules and regulations through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options on futures contracts, including Crude Oil Contracts.

26.   Crude Oil and other futures and options contracts are standardized according to the terms specified by the NYMEX or the other contract market/commodity exchange that creates the futures contract. Futures markets, the standardized and fungible futures and options contracts, and the mechanism of the clearing house to hold the other side of every futures and options contract, are specifically designed to facilitate and ease trading in one central marketplace by traders who are located throughout the world.

27.   At least hundreds of Crude Oil Contracts were traded on many business days during the Class Period. The number of persons or entities who transacted in Crude Oil Contracts during the Class Period is believed to be in the thousands, and those persons or entities are geographically dispersed. Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

28.   Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).

29.   Futures contracts are firm commitments to make or accept delivery of a specified quantity and quality of a commodity during a specific month in the future at a price agreed upon at the time the commitment is made.

9

30.    There are two sides to a crude oil futures contract traded on a contract market/exchange. The "long" side is the buyer of the contract who is obligated to take delivery and pay for the commodity. The "short" side is the seller of the contract who is obligated to make delivery of the commodity.

31.    However, only a small percentage of all crude oil futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of crude oil by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

32.    Crude oil options on futures contracts are likewise similarly standardized, fungible, and traded via a central clearing house, the NYMEX.

33.    Accordingly, each and every Class member transacted in standardized and fungible Crude Oil Contracts in the same centralized NYMEX market and subject to the same NYMEX market rules and regulations.

34.    In the absence of manipulation, the NYMEX market for Crude Oil Contracts was an efficient market and the prices therein reflected available information.

35.    Common issues of law and fact include but are not limited to:

(I)     whether the manipulative activities alleged herein existed;

(ii)    whether such manipulative activities had the result of manipulating prices in the market for NYMEX Crude Oil Contracts;

(iii)    whether, as a result of any such violation, Defendants caused prices in the NYMEX market for Crude Oil Contracts to be artificial during the Class Period;

(iv)    if so, to what extent were prices artificial;

(v)    whether Defendants' course of conduct violated the CEA; and

(vi)    whether a constructive or actual trust should be impressed upon the ill-gotten gains obtained by Defendants as fruits of their misconduct.

36.    Plaintiff's interests are typical of, and not antagonistic to the interests of, the Class.

37.    Plaintiff has retained competent counsel experienced with class actions and commodities litigation and intends to vigorously prosecute this action.

38.    Common issues predominate.  A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, a class action is the only method by which Plaintiff and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.  The size of individual damages is small in comparison to the complexity and scope of the Defendants' alleged manipulation and unlawful conduct.

39.    (a)    Upon acceptance of any transaction of Crude Oil Contracts on NYMEX, the NYMEX clearinghouse effectively becomes the seller to every buyer of a NYMEX Crude Oil Contract and the buyer to every seller.  The NYMEX clearinghouse's functions include matching and recording trades, collecting and maintaining margins, allocating margins according to the positions of the clearing members, and matching open short with open long positions.

(b)    Class members' identities and their trades generally can be identified by members of the NYMEX clearing house and/or the futures brokers clearing through NYMEX.

(c)      Plaintiff does not anticipate any difficulties in the management of this action as a class action.

## FRAUDULENT CONCEALMENT

40.      By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants, inter alia, engaged in secret orchestrated trading to manipulate and make artificial prices for Crude Oil Contracts on NYMEX and ICE.

41.      Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until partial details concerning the scheme began to become public in 2011.

42.      Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about 2011.

43.      Due to the fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## AS AND FOR A FIRST CAUSE OF ACTION FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. SECTION 1

44.      Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

45.      Plaintiff transacted in one or more NYMEX Crude Oil Contract(s) and/or WTI Derivatives during the Class Period, and was injured as a result of the Defendants' manipulation

12

of the price of those Crude Oil Contracts, and/or the price of the crude oil underlying Crude Oil futures/options contracts, in violation of the CEA, 7 U.S.C. § 1 et seq.

46.    Defendants' trading activities alleged herein constitute manipulation of the price of Crude Oil Contracts, and/or the price of crude oil underlying Crude Oil futures/options contracts, in violation of Section 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

47.    As set out more fully above, during the Class Period, Defendants engaged in a pattern of manipulative and surreptitious trading that caused the market prices for Crude Oil Contracts to be artificial.  Defendants had the ability to influence market prices, intended to influence market prices, and through their conduct caused artificial prices to exist during the Class Period.

48.    Through the activities alleged herein, Defendants perpetrated a fraud on the market in the market for Crude Oil Contracts.

49.    By engaging in the foregoing unlawful acts and practices, which were designed to mislead Plaintiff and the Class, Defendants, in or in connection with the purchase and/or sale of Crude Oil Contracts, (i) cheated or defrauded or attempted to cheat or defraud Plaintiff and the Class; (ii) willfully made false reports and statements; and/or (iii) willfully deceived or attempted to deceive Plaintiff and the Class with regard to Plaintiff's and the Class's orders for transactions in Crude Oil Contracts, in violation of Section 4b(a)(i), (ii) and (iii) of the CEA, 7 U.S.C. § 6b(a)(I), (ii), (iii).

50.    Defendants entered into transactions involving Crude Oil Contracts, and intentionally undertook these transactions to cause the prices of Crude Oil Contracts to be

reported registered or recorded that were not true and bona fide prices, in violation of Section 4c

of the CEA, 7 U.S.C. §6c.

51.     Plaintiff and the Class are each entitled to actual damages for the violations of the

CEA alleged herein.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR AIDING AND ABETTING VIOLATIONS OF
## THE COMMODITY EXCHANGE ACT

52.     Plaintiff incorporates by reference and realleges the preceding allegations, as

though fully set forth herein.

53.     Defendants knowingly aided, abetted, counseled, induced, and/or procured the

violations of the CEA alleged herein.  Defendants did so knowing of other Defendants'

manipulations of Crude Oil Contract prices, and willfully intended to assist these manipulations

to cause the price Crude Oil Contracts to be artificial during the Class Period, in violation of

Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

54.     Defendants substantially assisted in the aforesaid manipulations while

simultaneously being informed of the nature of the manipulative pattern of trading

engaged in by Defendants.

55.     Plaintiff and the Class are each entitled to actual damages for the violation of the

CEA alleged herein.

56.     As a further direct and proximate result of the acts of Defendants, Plaintiff and

the Class have been required to act in the protection of their interests by filing this action, and

have incurred attorneys' fees, and other expenditures in a sum to be proven in trial.

### AS AND FOR A THIRD CAUSE OF ACTION FOR
### DISGORGEMENT OF UNJUST ENRICHMENT OR IMPOSITION OF A
### CONSTRUCTIVE TRUST

57.     Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

58.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff and the Class have been damaged and Defendants have been unjustly enriched.  Plaintiff and the Class should be compensated from sums disgorged from Defendants.  A constructive trust should be imposed on Defendants' unlawfully obtained profits.

### JURY DEMAND

59.     Plaintiff demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment:

(a)     Ordering that this action proceed as a class action as to all claims previously alleged;

(b)     awarding money damages, including prejudgment interest, on each claim in an amount to be established at trial;

(c)     awarding statutory attorneys' fees and costs, and other relief;

(d)     impressing a trust on the ill-gotten gains of Defendants in the ultimate res of which each Class member shall have an undivided interest;

(e)     directing further proceedings to determine the distribution of the trust among

Class members, <u>inter se</u>, and award attorneys' fees and expenses to Plaintiff's counsel; and

(f)     awarding such other relief as to this Court may seem just and proper.

Dated:     New York, New York
           May 31, 2011

                    LAW OFFICE OF
                    CHRISTOPHER J. GRAY, P.C.

                    By: _____
                    Christopher J. Gray
                    460 Park Avenue, 21ST Floor
                    New York, NY 10022
                    (212) 838-3221
                    (212) 937-3139 (fax)
                    Chris@investorlawyers.net

                    LOUIS F. BURKE, P.C.
                    Louis F. Burke
                    Leslie Wybiral
                    460 Park Avenue, 21ST Floor
                    New York, NY 10022
                    (212) 682-1700
                    (212) 808-4280 (fax)
                    lburke@lfblaw.com

                    OF COUNSEL:

                    Gregory S. Collett, Esq.
                    641 President Street, 2nd Floor
                    Brooklyn, NY  11215
                    (917) 553-4339
                    (718) 408-9572 (fax)
                    greg.collett@collettlegal.com

                    *Counsel for Plaintiff*